Case 1:07-cv-04827-PKC    Document 17-8    Filed 02/22/2008    Page 1 of 6

# NEW YORK CITY
## DEPARTMENT OF INVESTIGATION
### CORRECTIONAL SERVICES UNIT

TO: File
FROM: Cindy Tsui
Case Name: CASTRO

DATE: January 17, 2008
Case Number: DOC 06/27
Cactis Number: 0605457

## CLOSING MEMORANDUM

The following is a summary only of information pertaining to this investigation and may not contain each and every fact learned during the course of this investigation.

**ORIGIN OF CASE:**
On May 15, 2006, Captain Gregory Navoy #1354 of the Department of Correction Investigation Division reported the allegation to the Office of the Inspector General ("OIG") via the complaint line.

**NATURE OF ALLEGATION:**
Inmate Christine Disla ("Disla") B/C 241-06-00229 (a male inmate) alleged that he was forced to perform oral sex on Correction Officer Ricardo Castro ("Castro") #11807 while he was held at the Bronx Supreme Court.

**RESULTS OF INVESTIGATION:**
On May 15, 2006, OIG investigators interviewed Disla at the Bronx Supreme Court. During the interview, Disla claimed to have initially met Castro on March 24, 2006 while he was held there for court. He stated that Castro walked by his cell, smiled at him and asked him what size his breasts were. Castro told him that he liked his breast and asked him how much he paid to have them done. He then told him that he was always interested in transvestites. After talking to Disla, Castro left and returned at approximately 1430 hours with some food and two cigarettes. Disla informed Castro that he will be back in court on May 15, 2006 and asked if he would be working. According to Disla, Castro instructed him to make sure that he is held in a holding cell alone on the fourth floor the next time he returns to court.

On the day of the incident, Disla was locked in a cell with another inmate. Castro allegedly walked by his cell, stopped and showed him a pack of Newport cigarettes. He then proceeded to fondle his breast and told Disla that the cigarettes were for him. A short time later, Castro came back to his cell and proceeded to escort Disla out of the area. He handcuffed Disla after he asked another officer to unlock the gate to his cell. Castro took the Bible he (Disla) was holding and placed two cigarettes inside the Bible before returning it to him. He then escorted Disla to the elevator area and stood behind him while waiting for the elevator. As they waited, Castro allegedly inserted his finger inside Disla's anus and quickly removed it. Disla recalled observing two inmates collecting garbage at the time and they stepped inside the elevator when it arrived. Castro instructed the female elevator operator to take the inmate workers to their assignments and informed her that he would call for her if he needed her. Disla alleged that after the elevator doors closed and left the area, Castro pulled his hair and forcefully pushed him down to his knees. He then unzipped his pants and told Disla to suck his penis (which he did.) After performing fellatio on Castro for approximately forty five seconds, Castro ejaculated inside Disla's mouth.

According to Disla, Castro called for the elevator operator and escorted him inside the elevator. They took the elevator to the ground floor where Disla was then locked into a cell with three other inmates. Disla then claimed he spat the semen into an empty milk carton he found inside the cell. Disla claimed that he attempted to seek medical attention from an unidentified male Hispanic officer. He informed

Page 1 of 5

23

DOC: 06/27
Cactis: 0605457
Case name: CASTRO

the officer that he had Castro's semen inside the milk carton. Disla claimed to have requested a rape kit be performed on him but said that instead of helping him, the officer went to Castro and informed him of the allegation. He further claimed that when Castro walked over to his cell he poured the semen back into his mouth. Disla alleged that Castro dragged him out of the cell by his hair and into the protective custody holding area where he was allegedly physically assaulted by other officers whom responded to the area. Disla claimed to have spat the semen into his right hand during the assault and smeared the semen across his shirt to preserve Castro's Deoxyribonucleic Acid ("DNA") as the officers continued to assault him. He said that the responding officers released him only after he told them that he spat the semen on the floor and they had the floor cleaned.

On May 15, 2006, OIG investigators safeguarded Disla's T-shirt in a paper bag and vouchered it at the Medical Examiner's Office under voucher number N049819.

Various inmates were asked to submit voluntary inmate statement following the alleged sexual assault on May 15, 2006. According to the statement written by inmate **Tyrone Fultor** (transferred to state prison on June 21, 2006), at 3:00 PM on May 15, 2006, an inmate came into the holding pen and claimed to have C.O. Castro's semen inside his mouth, but it was milk that the inmate had put inside his mouth. A second inmate, **Edwin Camacho** (transferred to state prison on May 22, 2006), wrote on May 15, 2006 at 15:00 hours, an inmate (Disla) was escorted into the front holding pen. He (Disla) stated to the inmates in the pen "watch me get a lawsuit; I'm going to set this C.O. up." He then put some milk in his mouth and began calling for a captain alleging that C.O. Castro's semen was in his mouth when in fact it was milk. According to inmate **Orlando Rodriguez** (released on February 15, 2007), he wrote on May 15, 2006, an inmate (Disla) told me that "he was going to set an officer up." He put milk in his mouth and said he sucked him off. He asked for a Captain and said he had semen in his mouth. He said he can describe "it." The inmate told me he was "going to get money out of him." When I was with him in the holding pen upstairs, he told me the same thing.

Subsequent to the alleged sexual assault, Disla was medically evaluated by Dr. Patrice Milord in the clinic at the George Motchan Detention Center. Dr. Milord noted that Disla alleged he was sexually assaulted in the Bronx Supreme Court. He claims he was kicked in the left leg, back, head and was forced to perform oral sex on one of the officers there. On examination, Dr. Milord noted that Disla complained of pain to the left thigh. He also indicated that there is tenderness to Disla's left leg, scratches to the left arm and he was observed limping. According to the medical report, there was no treatment indicated for the alleged sexual assault.

On May 16, 2006, OIG investigators interviewed Castro at the Health Management Division. He spoke to OIG investigators voluntarily.

**REDACTED**

2006, Castro observed Disla being held in a cell while at work in the Bronx courts. He stated that he walked by the cell where Disla was held and Disla asked him (Castro) to ejaculate in a cup so that he could drink it. Castro ignored his comment and proceeded to escort Disla and three other inmates to another holding area. While inside the cell, Disla was harassed by other inmates. Castro removed him from that cell and escorted him to the PC holding cells. As Castro removed Disla from the general population holding area, he was told by the other inmates that Disla was going to set him up. Castro

Page 2 of 5

24

DOC: 06/27
Cactis: 0605457
Case name: CASTRO

admitted to getting upset and confronted Disla while he was in the PC holding area but denied ever having sexual contact or physically assaulting him on the day of the incident. Castro volunteered to provide the OIG with a DNA sample when asked using the Buccal Swab Collection Kit. The kit was subsequently vouchered at the Medical Examiner's Office under voucher number N049841.

Disla's DNA sample was also collected for comparison on May 18, 2006. His DNA was vouchered at the Medical Examiner's Officer under voucher number N049820. On May 19, 2006, details of this allegation were referred to the Bronx District Attorney's Office for review.

After reviewing voluntary inmate statements written on May 15, 2006, the Bronx District Attorney's Office interviewed inmate Orlando Rodriguez ("Rodriguez") on August 17, 2006. According to Rodriguez, he was held in the same cell as Disla on the day of the incident. Disla asked him if he wanted cigarettes and told him that he can get cigarettes from Castro because he has him on a "string." As Castro walked by their cell, Disla tried to get his attention by showing him his breast. Rodriguez stated that Castro walked right by their cell a few minutes later and ignored Disla. He stated that Disla told him that "he was going to set Castro up and get some money out of him." Soon after, Castro called their names and they were escorted out of their holding cell. Before Disla left the cell, he took a sip of milk from the carton they had during lunch and he held the milk in his mouth. They were escorted to the corridor and Castro instructed him to wait by the desk with the desk officer while he escorted Disla downstairs. Rodriguez waited by the desk for almost ten minutes and became impatient because Castro did not come back for him. He recalled complaining to a female Hispanic officer and was subsequently escorted downstairs to the general population holding area to await transportation back to Rikers Island. Rodriguez did not see Disla in the holding cell downstairs but when he turned around, he noticed Disla causing a commotion by the elevator area screaming that he needed a rape kit because he has Castro's semen in his mouth. A few officers walked over to Disla and attempted to calm him down; however when more staff members approached him, Disla spat on the floor. Rodriguez then observed Castro walking up to Disla and asking him what he wanted from him. Disla was then restrained and a male Hispanic officer cleaned up the floor.

Disla was also interviewed by the Bronx District Attorney's Office on August 17, 2006 along with OIG investigators where he mentioned he retained counsel for a law suit against the City. He reiterated his version of events and denied every having a conversation with other inmates telling them that he will "set Castro up." Additionally, Disla was asked why he left out essential details such as Castro inserting his finger in his anus while waiting for the elevator in his written statement that was written right after the alleged sexual assault; however, he brought that to the attention of the OIG investigators during the verbal interview. Disla responded by insisting that the report he made to the OIG investigators was truthful and the reason he might have left out the details in the written statements was because he was "traumatized."

On May 4, 2007, the Medical Examiner's Office released the DNA analysis laboratory examination report #FB06-0796. The result of the analysis indicates that there was semen and "amylase" present on the T-shirt obtained from Disla. The analysis indicates there were a minimum of at least two contributors to the stains on Disla's T-shirt. According to the analysis, the major contributor of these stains is Disla. No legally conclusive identification could be made regarding the minor contributor/s to this mixture.

25

DOC: 06/27
Cactis: 0605457
Case Name: CASTRO

On August 7, 2007, the Bronx District Attorney's Office confirmed with the OIG that they are declining to further pursue Disla's sexual abuse allegation against Correction Officer Ricardo Castro due to contradicting medical evidence and Disla's lack of credibility. Additionally, the Bronx DA's Office also declined to prosecute Disla for causing a false police report (#2006-044-06511) accusation of sexual abuse to be made.

On October 26, 2007, Correction Officer Cruz Adams ("Adams") was interviewed at the OIG under the guidelines of Mayor's Executive Order #16. According to Adams, she worked as the elevator operator at the Bronx Supreme Court on May 15, 2006. She recalled seeing Disla early in the morning around 8 or 9 AM in the search line where all the inmates were searched. She did not recall if Castro interacted with Disla that day, nor did she recall speaking with him during her tour. Adams also denied receiving any complaints from Disla on the day of the incident.

Captain Abdur Mohammad ("Mohammad") was also interviewed under the guidelines of Mayor's Executive Order #16 on November 29, 2007 regarding Disla's alleged physical assault that occurred subsequent to the alleged sexual assault at the Bronx Supreme Court on May 15, 2006. According to Mohammad, he first heard of Disla's accusation of sexual assault while he was touring the "go back" holding area on the first floor. After being notified of the sexual abuse allegation, he instructed staff members to isolate Disla from the general population inmates in the "go back" holding cells to the protective custody (PC) holding cells. Mohammad stated that after he was informed of the allegation, Castro was not allowed to be close to Disla after he was isolated to the PC holding cells. He stated that during the time he was in the "go back" holding area, he did not witness Disla involved in a use of force with staff members or other inmates. In fact, Mohammad described Disla as more than willing to be isolated. According to Mohammad, Disla was escorted to the PC holding cell without incident and investigators were on the scene soon after the proper notifications were made.

CONCLUSION AND RECOMMENDATIONS:
Based on the above, there is insufficient evidence to support inmate Christine Disla's claim of sexual assault. According to the medical examiner's report, Disla is the only positively identifiable contributor to the semen stains found on the T-shirt he provided to the OIG subsequent to the alleged sexual assault. Despite providing the ME with a DNA sample from Castro, the ME could not positively identify him as a contributor to the semen stains found on Disla's T-shirt. Moreover, Disla's claim can not be corroborated by any inmate witnesses; in fact, the witnesses indicated that they heard Disla talk about setting Castro up right before the inmate witnesses saw Disla sip some milk prior to notifying supervisors about the alleged sexual assault. Therefore, the allegation of sex abuse should be marked as "UNSUBSTANTIANTED." Additionally, based on information obtained through interviewing staff members and medical findings by the clinical staff, there is also insufficient evidence to substantiate Disla's claim of physical assault. As such, this portion of his allegation should also be marked "UNSUBSTANTIATED."

**REDACTED**

DOC: 06/27
Cactis: 0605457
Case name: CASTRO

"It is further recommended that a copy of this case closing be forwarded to the Intelligence Unit for filing.

Submitted By: _____  1/17/08
Cindy Tsui                                Date
Investigator

Reviewed By: _____  1/17/08
Vincent Valerio                           Date
Supervising Investigator

Approved By: _____  1/17/08
Meera Cattafesta                          Date
Inspector General

Page 5 of 5

27